# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JUDGE KAPLAN

|  |  |
|---|---|
| ABDARAHMANE WONE, on behalf of himself and all others similarly situated; MOHAMED MANSOUR KANE, on behalf of himself and all others simarly situated; AISSATA NIANG, on behalf of herself and her deceased husband Ousumane Wele; and DIOULDE WELE, MOHAMMADOE OUSMANE WELE, BOULO WELE and SALIOU WELE, on behalf of themselves and their deceased father Ousumane Wele, | Civil Action: **07 CIV 4007**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |
| Plaintiffs, |  |
| vs. |  |
| MAAOUYA OULD SIDI AHMED TAYA, formerly President of the Islamic Republic of Mauritania, |  |
| Defendant. |  |

**COMPLAINT FOR TORTURE; CRIMES AGAINST HUMANITY AND WAR CRIMES; SUMMARY EXECUTION; FORCED DISAPPEARANCE; CRUEL, INHUMAN AND DEGRADING TREATMENT; WRONGFUL DEATH; ASSAULT AND BATTERY; AND INTENTIONAL INFLICTION OF EMOTIONAL HARM**

Plaintiffs, by and through their attorney, allege the following:

## I. PRELIMINARY STATEMENT

1. This is a law suit for declaratory judgment, and compensatory and punitive damages for the gross human rights violations committed by Mauritanian government forces, including the military, civil authorities, and the *Sûreté Nationale* ("National Police"), (hereinafter collectively referred to as "Mauritanian Government Forces") under the command and control of defendant Maaouya Ould Sidi Ahmed Taya.  Plaintiffs seek

damages for violations of international law and the laws of the United States, on behalf of themselves and all other persons who were victims of the Mauritanian Government Forces from 1989 to 1991.

2. The gross human rights violations alleged herein constitute crimes against humanity, war crimes, torture, summary execution, and forced disappearance under the applicable provisions of international law. During the Senegalese-Mauritanian Border War of 1989 to 1991, the Mauritanian Government Forces deliberately employed murder, torture, forced deportation, and other gross human rights abuses against non-Arab civilian and military persons of the Haal Pulaar, Soninke, Wolof and Bambara ethnic groups (hereinafter collectively referred to as the "Black Mauritanians").  The violence committed against Black Mauritanians was part of a coordinated and nationwide campaign of ethnic cleansing in an effort to remove Black Mauritanians from their homes, and to establish uncontested domination of the Mauritanian land, military and government by the Arab-Berber population.  At all times relevant to this action, Maaouya Ould Sidi Ahmed Taya had command authority over the Mauritanian Government Forces, and bears legal responsibility for the crimes committed by the forces under his command.

3. This is a civil action for compensatory and punitive damages against Defendant Taya for the violations of state, federal and international law committed by the Mauritanian Government Forces acting under his command and control.

## II. PARTIES

### A. Plaintiffs

4. Plaintiff Abdarahmane Wone is a Mauritanian citizen and resident of New York, New York. In May of 1989, while at school at the age of fifteen, Plaintiff Wone was arrested and detained by the Mauritanian National Police.  In the custody of such Mauritanian Government Forces, he was beaten and tortured, and now suffers permanent physical defects.  In June of 1989, fearing for his life, he fled Mauritania to live as a refugee in Senegal.  He files this action on his own behalf, and on behalf of all others similarly situated.

5. Plaintiff Mansour Mohammed Kane brings this action for damages suffered as a result of being abducted, detained without process, and tortured for months by the Mauritanian military.  At the time of his abduction on November 18, 1990, he was a lieutenant in the Mauritanian military.  Plaintiff Kane was arrested without charge by and for the next five months was subject to abhorrent physical and psychological torture.  He was released on April 14, 1991, at which time he fled to the United States of America and received asylum.  Plaintiff Kane files this action on his own behalf and on behalf of all others similarly situated.  He is a resident of New York, New York.

6. Plaintiff Aissata Niang is a Mauritanian citizen and a resident of New York, New York. She was married to Ousmane Wele, a sergeant in the Mauritanian military, and at all times relevant to this action resided on the marine base in Nouadhibou, Mauritania with their four children.  On November 26, 1990, while Ousmane Wele was

3

on duty, he was abducted by the Mauritanian military and murdered in detention. The government never provided an explanation for his arrest and execution, and his body was never found.  Fearing for their safety, Plaintiff Niang took her children and fled from the military base.  She files this action on her own behalf, on behalf of her deceased husband, and on behalf of all others similarly situated.

7. Plaintiffs Dioulde Wele, Mohammadoe Ousmane Wele, Boulo Wele and Saliou Wele are the children of Plaintiff Aissata Niang and the deceased, Ousmane Wele. Fearing for their safety, after the murder of their father by the Mauritanian military, they were moved from their home on the Nouadhibou marine base and taken into the protection of relatives in another region.  They file this action on their own behalf, on behalf of their deceased father, and on behalf of all others similarly situated.

**B. Defendant**

8. Defendant Maaouya Ould Sidi Ahmed Taya was President of the Mauritania at all times relevant to this action.  Acting as President, he had command authority over all Mauritanian Government Forces.  Acting under his command and control, from 1989 to 1991, such Mauritanian Government Forces conducted a campaign of gross human rights violations against the Black Mauritanian population of that country.  He was deposed in August 2005 and now resides in Qatar.

## III. CLASS ACTION ALLEGATIONS

9. The Plaintiffs bring this action as a class pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all similarly situated Black Mauritanian men, women and children who were the victims of the Mauritanian Government Forces from 1989 to 1991, and who suffered physical and mental injuries caused by such forces acting under the command and control of Defendant Taya. The class also consists of surviving relatives of those who were killed in this campaign. All such persons are hereinafter collectively referred to as the "Class".

10. The exact number of class members is not known, but it is estimated that the Class includes tens of thousands of people. The Class is so numerous that joinder of all members is impracticable.

11. The claims of the named Plaintiffs, the class representatives, are typical of the claims of the Class in that:

   a) Each Plaintiff was caused to suffer physical or mental harm by Mauritanian Government Forces in violation of the law of nations, or is the surviving relative of such harmed persons;

b)    Each Plaintiff was arbitrarily arrested, subjected to inhumane and degrading treatment, and tortured or executed by the Mauritanian Government Forces; or is a surviving relative of such persons;

c)    Each Plaintiff was forced to flee their homes in fear of the Mauritanian Government Forces;

d)    Each Plaintiff is denied access to justice in the courts of Mauritania; and

e)    Each Plaintiff is a Black Mauritanian who was subject to the these abuses as part of a systematic campaign of ethnic cleansing led by Defendant Taya in an attempt to marginalize or destroy the non-Arab culture, language, and ethnic population of that country.

12. The named Plaintiffs are able to, and will fairly and adequately protect the interests of the class.

13. The named Plaintiffs and all other members of the Class have a unity of interest in bringing this action against the Defendant;

14. The common questions of law and fact affect and relate to all class members and dominate those questions that affect only the individual members. These include, but are not limited to:

a)    Whether Defendant authorized, commanded, or directed the acts of torture, forced disappearance and/or extra-judicial killings committed in violation of the laws of nations by the Mauritanian Government Forces under his command;

b)    Whether Defendant knew or should have know that the Mauritanian Government Forces under his command were deliberately committing torture, forced disappearance and/or extra-judicial killings, in violation of the laws of nations;

c)    Whether Defendant failed to punish or rectify such unlawful actions by forces under his control;

d)    Whether Defendant failed to take adequate and appropriate measures to prevent his subordinates from committing such gross violations of international law;

e)    Whether actions of Defendant give rise to liability under applicable international and domestic laws; and

f)    How to properly calculate damages for the Class.

15. Defendant Taya has acted in a manner generally applicable to the Class, making any class-wide relief appropriate.

16. The common issues of fact and law enumerated above predominate over any questions affecting solely individual members of the Class and a class action is superior to other methods available for the fair and efficient adjudication of this controversy.

## IV. JURISDICTION AND VENUE

17. This court has jurisdiction over the claims asserted in this complaint under the Torture Victim Protection Act, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350); the Alien Tort Claims Act, 28 U.S.C. § 1350 and 28 U.S.C. § 1331; and over the state law claims pursuant to 28 USC § 1367. The Torture Victim Protection Act provides federal jurisdiction for acts of torture and summary execution, no matter where committed. The Alien Tort Claims Act provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." Plaintiffs' causes of action arise under, among others, the following laws, agreements, resolutions and treaties:

a)      Customary international law;

b)      United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

c)      Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

d)      Geneva Conventions of 1949, Conventions I-IV, Aug. 12, 1949, 6 UST 3114, 3217, 3316, 3516; TIAS No. 3362-3365; 75 UNTS 31, 85, 135, 287;

Additional Protocols I and II to the Geneva Conventions of 1949, opened for signature Dec. 12, 1977, 16 ILM 1391, 1442 (1977).

e)    International Covenant on Civil and Political Rights, G.A. Res. 2220A(i), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

f)    Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984);

g)    International Convention on the Elimination of All Forms of Racial Discrimination, 660 U.N.T.S. 195 (1966);

h)    Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

i)    United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. Doc. A/CONF/611, ANNEX I, ESC Res. 663(c), 24 U.N ESCOR Supp. (No. 1), at 11, U.N. Doc. E/3048 (1957), amended, E.S.C. Res. 2076, 62 U.N. ESCOR Supp. (No. 1), at 35, U.N. Doc. E/5988 (1977);

j)    African Charter on Human and People's Rights, OAU Doc. CAB/LEG/67/3 rev. 5, 21 I.L.M. 58 (1982).

k)    Common law of the United States of America;

l)    Statutes and common law of the State of New York, including but not limited to wrongful death, assault and battery, intentional infliction of emotional distress and respondeat superior; and

m)    Laws of Mauritania.

18. The United States District Court for the Southern District of New York is the proper venue of this action pursuant to 28 U.S.C. § 1391.

## V. STATEMENT OF FACTS

### A. Background

19. Although conflicts between Arab-Berbers and Black Mauritanians can be traced back centuries, political power was relatively balanced in the years prior, and immediately subsequent to national independence in 1960. Following the influence of "Nasserism" and "Ba'athism" throughout the Arab world, the Arab leaders holding power in Mauritania began to purge Black Mauritanians from major institutions in an effort to effect the "Arabization" of the country.

20. By 1989, "Arabization" had led to explicitly national policies of discrimination against Black Mauritanians in education, language, employment, access to loans and

credit, and the administration of justice.  As a result, hundreds of black professionals were dismissed from their jobs, former prisoners were kept under close surveillance, and a sense of fear and insecurity was imposed on the Black Mauritanian community.

21. In 1989, the killing of Senegalese farmers by Mauritanians in the Senegal River basin triggered explosions of ethnic violence in the two countries.

22. The Mauritanian government, lead by Defendant Maaouya Ould Sidi Ahmed Taya, used this occasion to activate new land legislation that declared Black Mauritanians living alongside the river to be "Senegalese."  This legislation stripped tens of thousands of Black Mauritanians of their citizenship and their property.

23. Soon after, throughout 1989 and early 1990 an estimated 50,000 and 70,000 Black Mauritanians were forcibly deported to Senegal and Mali by forces acting under the command and control of Defendant Taya.  These people were arrested in their homes and offices, or abducted in the street.  Prior to deportation, many were taken to police stations for questioning regarding their knowledge of the African Liberation Forces of Mauritania or about their "Senegalese" ancestry.  Stripped of their identity papers, valuables and homes, these citizens were deported.

24. Despite government claims that only those who had obtained Mauritanian citizenship fraudulently would be expelled, the persons deported were, for the most part, people who had lived in Mauritania for generations; their identity papers had either been confiscated or destroyed by the Mauritanian Government Forces as they were expelled. Many deportees who tried to return to Mauritania were either arrested and detained, or

expelled back to Senegal.  Many of those who fled or were expelled from Mauritania and have yet to recover their rights and privileges as Mauritanian citizens.

25. The Mauritanian government presented the conflict as an international affair. However, there is evidence that the forced deportation and violence inflicted on the Black Mauritanians was part of a systematic campaign of ethnic cleansing conducted by the Arab-Berber government to marginalize or destroy the Black Mauritanians as a national, ethnic and/or racial group within that country.

**B. Extrajudicial Killings and Torture**

26. Under the command and control of Defendant Taya, five to six hundred black political prisoners were systematically executed or tortured to death by Mauritanian Government Forces between November 1990 and March 1991.  Additionally, Mauritanian Government Forces committed human rights violations against the Black Mauritanians along the Senegal River Valley, including murder, torture, arbitrary arrest and confiscation, and the destruction of property.

27. Estimates of the number of Black Mauritanians arrested from the military and civil service range from one to three thousand.  The detainees were held incommunicado, and savagely tortured to obtain confessions or information about others.

28. The methods of torture used included beatings, burns, electric shocks applied to the genitals, stripping prisoners naked and spraying cold water over them, and

performing a "jaguar" torture which involved tying a victim's hands and feet, suspending him upside down from a bar, and beating his genitals and the soles of his feet with a bar.

29. In March 1991, when the surviving detainees were freed, the released prisoners revealed the fate of those who had been tortured or murdered. Of those who survived imprisonment, many remain crippled, paralyzed or maimed from the torture, and some died following the release.

## C. Plaintiff Abdarahmane Wone

30. In May 1989, Plaintiff Wone's father, Baba Galle Wone, was deported by the Mauritanian National Police. Prior to his deportation, he had been a prominent businessman and religious leader living with his family in Kaedi, Mauritania. On the eve of his deportation, Mauritanian Government Forces entered the Wone home, seized Baba Galle Wone and brought him to his fabric store to take inventory. Returning with him to the Wone house early the next morning, the Mauritanian Government Forces demanded that all the people living in the home be detained for questioning. There were fourteen people present, including the stepmother, brothers, sisters, cousins and nephews of Plaintiff Wone. With only the clothes they were wearing, the entire family was immediately deported to Senegal. Mauritanian Government Forces seized all of Baba Galle Wone's property, including his home, his business and all of his documents. He was prohibited by the Mauritanian Government Forces from ever returning to Mauritania.

31. Plaintiff Abdarahmane Wone, fifteen years old at the time of his father's deportation, was living with his uncle and attending school in Nouakchott, the capital of Mauritania. While Plaintiff Wone was at school, early in May 1989, his uncle was deported by soldiers from the Mauritanian military. Having been warned of the deportation, Plaintiff Wone never returned to his home. Thereafter, he continued attending school, though now residing with his brother.

32. While at school in May 1989, there was fight between a large group of Arab-Berber and Black Mauritanian students. Plaintiff Wone was arrested by the National Police along with many of the other Black Mauritanian students. He was taken by the Mauritanian Government Forces to *Quatrieme Arrondissement*, the capital police station.

33. At the police station, Plaintiff Wone was beaten by uniformed officers and questioned about his involvement with the African Liberation Forces of Mauritania. Although until that time he had no involvement with this group, he was beaten severely with a club. The officers also smashed his ear repeatedly with a cupped hand. Plaintiff Wone continues to suffer permanent damage to the hearing in his right ear as a result of these abuses.

34. Plaintiff Wone spent one week in jail, during which time no formal charges were filed against him, and his only food was provided by the International Red Crescent.

35. After release, Plaintiff Wone did not attend school and remained in constant fear for his safety.  He continued to live in Mauritania only long enough to plan his escape from the country.  In June 1989, despite harassment at the airport by Mauritanian Government Forces, Plaintiff Wone was able to board a plane and escape to Senegal.

36. From 1989 to 2000, Plaintiff Wone lived as a refugee in Senegal and completed high school in the City of Diourbel.  In 2000, he resettled to the United States, where he currently holds permanent resident status.  He has never returned to Mauritania.

## D. Mohamed Mansour Kane

37. Plaintiff Mohamed Mansour Kane was a Lieutenant Sergeant in the Mauritanian Military Forces.  He had served nine years, and at the time relevant to this action was stationed at military base "PK-55," located 55 kilometers north of Nouadhibou.

38. On the night of November 18, 1990, Plaintiff Kane was sent on a mission from his base to the capital of Nouakchott.  Following standard procedure for such a mission, he checked his weapon with his superior officer.  He left the base in an Army truck, accompanied by an Arab Captain Lobat from the artillery division and an Arab Sergeant.

39. Captain Lobat stopped the truck a few miles from the base. Four soldiers emerged from its rear compartment and Plaintiff Kane was informed that he was under arrest. He was then blindfolded, handcuffed and shoved into the rear of the truck. When he asked what he was being arrested for and where they were going, he was struck in the head with a rifle. Bound and blindfolded in the back of the truck, he was driven in circles, which caused him confusion and disorientation.

40. As the truck continued toward an unknown destination, two more arrested Black Mauritanian soldiers were picked up on the road and placed into the truck with Lieutenant Kane. One of the men reported to Plaintiff Kane that he had previously escaped but was sent back from the Western Sahara border by the occupying Moroccan soldiers. Speaking in their language, which the Arab soldiers did not understand, the three men discussed the possibility of escape. The soldier who had previously escaped warned that they would be killed by the Arab soldiers. Lieutenant Kane advised that escape would be impossible from the moving vehicle, given that they were handcuffed, blindfolded and unarmed. There was no choice but to wait until they had a chance to find out why they had been arrested. The men were beaten and ordered to stop speaking.

41. At dawn the next morning the men arrived at *Inal*, a train stop and military base that had been transformed into a detention center for the torture and killing of Black Mauritanian service members. Still blindfolded and handcuffed, the men were pulled from the back of the truck by their legs. Landing on the ground, each soldier was beaten by uniformed military personnel. Plaintiff Kane and the other soldier were ordered to state their names. After giving their names, they were accused of lying about

their identities and the soldiers took turns beating Plaintiff Kane and the other prisoner with metal sticks.

42. Plaintiff Kane was then dragged to a small standalone enclosure in the complex. A ten-foot long railroad tie jutted up from the dirt in the center of the rusting aluminum shack. Stripped naked, his arms were bound behind his head and around the railroad tie. His feet were bound behind the tie. After suffering for hours in this position another Arab captain entered the room. The Captain placed a small tape recorder on a table before him, pressed the record button and said: "Speak." Plaintiff Kane replied that he did not know what to say, that he did not know why he had been arrested, and that he had done nothing wrong. He was beaten mercilessly.

43. Plaintiff Kane was left bound and upright on the railroad tie for four days. He was never taken to the bathroom, rarely received water and never fed. During the four day ordeal the recorder was placed before him numerous times. Each time he was ordered to speak. Each time Plaintiff Kane insisted he had had nothing of value to say, and each time he was brutally beaten and left hanging from the post in the decrepit cell.

44. Because he was an officer, Plaintiff Kane was segregated from the rest of the black soldiers who were being held. Day and night he heard their screams as they were tortured and executed. Beyond the agonizing beatings that he personally endured, Plaintiff Kane was penetrated by the misery, torture and murder of many others outside of his cell, just yards from where he was confined.

45. After four days he was removed from the railroad tie. Collapsing to the ground, his hands and feet were promptly rebound and he was suspended by his ankles, still naked, from a metal bar. This is the position from which the guards would inflict what is referred to as the "jaguar" torture technique. Jaguar torture consists of suspending the naked victim upside down from a metal bar and beating, burning, and applying electric shocks to the body's most sensitive areas, especially the soles of the feet and genitals.

46. Plaintiff Kane, fearful that the jaguar torture would end his life, gave false confessions to any and all activities that he thought might persuade his captors not to torture him further. The false confessions satisfied his torturers and Plaintiff Kane was taken to another cell.

47. Plaintiff Kane was crammed into a roughly fifteen by eight-foot cell with ten other Black Mauritanian officers who had also been arrested. All had been tortured and would continue to be tortured. The prisoners had only their deteriorated clothing to cover themselves during the cold nights. Disease was rampant. The open infected wounds and the half-barrel in the corner, which served as the officers' only toilet, left a stench that Plaintiff Kane compared to the smell of dead animals. The prisoners were rarely fed, and then only enough rice or crackers to keep them alive. No medical assistance was provided. Only when an inmate died could the surviving prisoners call for the guards to come and remove the deceased man.

48. Plaintiff Kane and the other soldiers were randomly selected for torture sessions. One evening Lieutenant Kane and two other officers were taken from their

cells. They were driven around blindfolded, being repeatedly struck and verbally abused. They were told that their families and all Black Mauritanians would be enslaved or exterminated, and that their wives and children would be raped and tortured. The three men were told they were to be killed because they were the "brains" of a separatist movement among Black Mauritanians. They were beaten and ordered to confess to being part of this plot.

49. When the car stopped, the men were stripped naked, tied to the back of the vehicle and soaked with cold water in the frigid night. One of the men was so sick that he lost control of his bodily functions and began to hallucinate. While still tied to the back of the vehicle next to Plaintiff Kane, this officer died. The lifeless body of his friend was left hanging on the back of the truck next to Plaintiff Kane.

50. Plaintiff Kane and the other surviving officer were told that they would be dragged to death across the desert scrabble if they did not confess to being part of a rebel militia. Neither man had anything to confess. The Arab soldiers dragged the other officer first because he was "fatter." The officer's wrists, remained cuffed behind his back as he was dragged behind the jeep across the rocky desert. This man somehow survived, and was brought back and placed beside Plaintiff Kane with severe gashes throughout his body.

51. When day finally broke after the night of physical and psychological torment, Plaintiff Kane saw that he was only a few hundred yards from the camp where he was being held prisoner. Across the field he witnessed other soldiers being tortured and killed. He was returned alive to his cell.

52. On November 28, 1990, Plaintiff Kane and many of the prisoners were given tea to celebrate Mauritanian Independence Day. Under orders of the commanding officer, twenty-eight of these men were randomly numbered. To "honor" the Mauritanian Independence Day, Plaintiff Kane witnessed preparations, as all twenty-eight of these Black Mauritanian soldiers were taken and hanged by the Mauritanian Government Forces.

53. On December 7, 1990, Plaintiff Kane and the other surviving prisoners were to be taken to Wojaha, a camp near Nouadhibou. The prisoners were hooded, tied together and smashed upright into an open truck for the roughly 250-kilometer ride from *Inal*. Many prisoners died in transit. The dead and surviving men remained smashed together for the length of the journey.

54. In Wojaha, the conditions were only slightly improved. The prisoners occasionally were given something to clean their wounds with, only to experience another round of torture at night. Food consisted of rice, perhaps leftover meat scraps, or hard crackers. So many died in the three months while Plaintiff Kane was held at Wojaha that the Arab soldiers complained their diesel fuel was running short from the repeated trips to dump and burn the bodies of Black Mauritanian servicemen in the desert.

55. After three months at Wojoha, Plaintiff Kane was transferred to another prison called Jereyda. This time he was moved by airplane. Of all the terror he had endured, this journey frightened him the most. As he and the other prisoners sat

chained to one another in the hull of a military cargo plane, unaware of their destination, they were paralyzed with the fear that they would be thrown from the back of the plane to fall thousands of feet to their death.

56. At Jereyda, Plaintiff Kane was not tortured. He and the other prisoners were given access to some medication to clean their infected sores, and for the first time in months he was only handcuffed during the night.

57. The Mauritanian Government Forces informed Plaintiff Kane and the other surviving Black Mauritanian soldiers that they would be officially accused of crimes, and tried in court. With some of these soldiers paralyzed and all showing obvious signs of torture, the attempt to organize a trial was forgone.

58. Plaintiff Kane and the other surviving Black Mauritanian soldiers were released on April 14, 1991. He reported back to military headquarters, was given his salary for the time he was imprisoned, and was discharged from the military.

59. Plaintiff Kane went to Nouakchott, where he remained under continual surveillance. He soon received a visa and departed to the United States. He received asylum in 1994.

**E. Plaintiff Aissata Niang**

60. At all times relevant to this complaint, Plaintiff Niang was living with her husband, Ousumane Wele, and their four children on the marine base in Nouadhibou.

Ousumane Wele had been a enlisted soldier in the Mauritanian military forces for fifteen years, and had received the rank of sergeant.

61. On November 27, 1990, Ousumane Wele was arrested by Mauritanian military soldiers as part of a campaign to remove all Black Mauritanians from military service. He was one of about twenty black soldiers who were arrested at his base, all of whom were held without charges.

62. With the wives of the other detainees, Plaintiff Niang questioned the military administration about the disappearances and rumored arrests of their husbands. The military administration told the women that Ousumane Wele and the other Black Mauritanian soldiers were on a special mission and would return after the mission was complete. On November 30, 1990, the families of the arrested soldiers stopped receiving the soldiers' salaries and the army stopped delivering food rations.

63. Fearing for the safety of her children, they were sent to live with relatives in Nouakchott. Plaintiff Niang remained on the Marine Base, waiting for news from her husband. Fearing for her own safety, in January 1991, she left to stay with relatives in the Village of Djeol. Thereafter, the Black Mauritanian women who remained on the marine base were forcefully removed by the Mauritanian Government Forces.

64. In March 1991, some of the Black Mauritanian soldiers who had been detained with her husband were released. Ousumane Wele was not among those who returned. Surviving soldiers informed Plaintiff Niang her husband had been tortured and killed while held in *Inal.*

65. Some months later in 1991, Mauritanian Government Forces visited Plaintiff Niang to confirm that her husband was dead. The soldiers demanded that she sign documents to receive certain death benefits. She refused to sign until more information was provided about the justification and cause of his death. The soldiers provided her with no information. His remains were never found.

66. In 1992, Plaintiff Niang moved to Nouakchott and joined the Widow's Solidarity Committee, which had formed to petition the Mauritanian government for information about the deaths of their husbands and to demand justice. The Mauritanian government rebuffed all attempts by the Widow's Solidarity Committee. The Widow's Committee hired an attorney in an attempt to attain redress through the Mauritanian judicial system. These efforts proved unsuccessful due to the harassment, threats and intimidation of the widows and their attorney by the Mauritanian Government Forces. The Widow's Solidarity Committee also filed a complaint with the African Commission on Human and Peoples' Rights in The Gambia, but no substantial progress has been made in that venue.

## F. Plaintiffs Dioulde Wele, Mohammadoe Ousmane Wele, Boulo Wele and Saliou Wele

67. At all times relevant to this complaint, these Plaintiffs, the four children of Plaintiff Niang and the deceased Ousumane Wele, lived on the marine base in Nouadhibou. Following the arrest of their father, the children were subjected to food

shortages, evacuation from their home, the loss of their father, and separation from their mother as she waited for his return and attempted to find justice.

68. These conditions, and particularly the summary execution of their father, occurred as a direct result of the Defendant's systematic campaign of ethnic cleansing perpetrated against the Black Mauritanians.

## VI. GENERAL ALLEGATIONS

69. The acts described herein were inflicted deliberately and intentionally by Mauritanian Government Forces acting under the command and control of Defendant Maaouya Ould Sidi Ahmed Taya. Defendant ordered, knew or should have known of the above-described actions of their forces and failed to prevent or punish said actions.

70. The acts described herein were inflicted under color of law and under color of official authority, by national military and police forces operating as an organized armed group, under responsible command, and capable of implementing the laws of war within the territory under his control.

71. This proceeding could not be filed in Mauritania because from the time that these acts occurred to the present, the parties responsible for the acts described herein were in control of the government; fearing for their lives, many plaintiffs left as refugees or asylees; plaintiffs remaining in the country were denied access to the courts through intimidation and threats of further violence; and in May 1993, the government of Mauritania passed the "Amnesty Decree" providing general amnesty to those persons

who would be accused of the mass killings and disappearances during the period from 1989 to 1991.

# FIRST CLAIM FOR RELIEF

## (War Crimes and Crimes Against Humanity)

72. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

73. The use of torture, relocation, deportation, forced disappearance, inhumane treatment and extra-judicial killing by Mauritanian Government Forces was neither random nor occasional, but rather was part of a widespread and systemic campaign of ethnic cleansing directed against the Black Mauritanian population. These acts occurred under the direction, encouragement or acquiescence of the Defendant.

74. The acts described herein constitute crimes against humanity and/or war crimes in violation of customary international law and the applicable provisions of the Geneva Conventions, and the Additional Protocols thereto, including but not limited to Common Article III of the Geneva Conventions; Additional Protocols II of the Geneva Conventions; the Fourth Geneva Convention; and Additional Protocol I of the Geneva Conventions.

75. The law of nations prohibits inhumane acts such as the willful extra-judicial killing, torture, deportation, forced disappearance and other inhumane acts to be

committed as part of a widespread or systemic attack against any civilian or prisoner population on political, ethnic or racial grounds.  Leaders, organizers, instigators and accomplices participating in the formulation of these acts are responsible for all acts performed by any person in execution of such plan.

76. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

77. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages for plaintiffs.

## SECOND CLAIM FOR RELIEF

### (Summary Execution)

78. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

79. The summary executions described herein were deliberate killings, not authorized as lawful punishment in accordance with due process of law.  These acts of summary execution were in violation of the Torture Victim Protection Act, customary international law, 28 U.S.C. § 1350, the common law of the United States, the statutes and common law of New York, the laws of Mauritania and the international treaties, agreements, conventions and resolutions described in paragraph 17 herein.

80. The decedents were placed in great fear for their lives, suffered severe physical abuse, agony, and mental abuse prior to their deaths. As a result of these summary executions, the deceased and their surviving family members have been damaged in an amount to be proven at trial.

81. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

### THIRD CLAIM FOR RELIEF

### (Forced Disappearance)

82. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

83. Ousumane Wele and other class members were abducted by Mauritanian Government Forces under the command and control of the Defendant, acting arbitrarily and without justification, cause or privilege. These abducted persons were last seen in the custody of Mauritanian Government Forces, acting under command and control of the Defendant. Thereafter, Defendant Taya and the Mauritanian Government Forces refused to disclose the fate of the abducted persons. The forcible disappearances described herein give rise to a presumption that the abducted persons were the victims of summary execution.

84. The forcible disappearances and presumed summary executions described herein were committed in violation of customary international law, 28 U.S.C. § 1350, the common law of New York, the laws of Mauritania and international treaties, agreements, conventions and resolutions described in paragraph 18 herein.

85. As a result of Defendant's acts, Ousumane Wele and other class members were placed in fear for their lives, were deprived of their freedom, were separated from their families and forced to suffer severe physical and psychological abuse, and are presumed to have been summarily executed.  The forcible disappearances caused Plaintiffs, including next of kin to Ousumane Wele and those class members similarly situated, to suffer severe mental anguish.

86. As a result of these summary executions, Plaintiffs and their missing relatives have been damaged in an amount to be proven at trial.

87. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## FOURTH CLAIM FOR RELIEF

### (Torture)

88. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

89. Defendant Taya, acting through agents in his chain of command, tortured the class representatives and the other members of the class. Plaintiffs feared for their lives and were subjected to severe physical and mental pain and suffering due to the intentionally and deliberately inflicted physical and psychological torment. Such treatment was inflicted for purposes which included, among others, punishing the victims, obtaining information, and to instill fear in the Black Mauritanian population. Plaintiffs were tortured with the consent and acquiescence of the Defendant.

90. The acts described herein constitute torture in violation of the Torture Victim Protection Act, the Alien Tort Claims Act, customary international law, the common law of the United States, the statutes and common law of New York, the laws of Mauritania, and/or the international treaties, agreements, conventions and resolutions described in paragraph 18 herein.

91. The torture of the Plaintiffs constitutes a crime in violation of the law of nations. The crime of torture rests on clear and definite norms of the present-day law of nations and is based on a standard of international character that is accepted by the civilized world and is defined with specificity.

92. As a result of the acts described herein, Plaintiffs have been damaged in an amount to be proven at trial.

93. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages.

## FIFTH CLAIM FOR RELIEF

### (Cruel, Inhuman, or Degrading Treatment)

94. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

95. The acts described herein had the intent and the effect of grossly humiliating and debasing the plaintiffs, forcing them to act against their will and conscience, inciting fear and anguish, breaking physical or moral resistance, and/or forcing them to leave their homes and country, in violation of customary international law, the Alien Tort Claims Act, the common law of the United States, the statutes and common law of New York, the laws of Mauritania, and the international treaties, agreements, conventions and resolutions described in paragraph 17 herein.

96. Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony.  As a result of the cruel, inhuman or degrading treatment described above, Plaintiffs have suffered damages, including, but not limited to, severe mental and emotional pain and suffering in an amount to be proven at trial.

97. The acts and omissions of Defendant and forces under his command and control were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## SIXTH CLAIM FOR RELIEF

### (Wrongful Death)

98. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

99. Plaintiffs Dioulde Wele, Mohammadoe Ousmane Wele, Boulo Wele, Saliou Wele, Aissata Niang and others similarly situated are the surviving family of Black Mauritanians who were summarily executed by the Mauritanian Government Forces, acting under the command and control of the Defendant.

100. As a proximate result of these summary executions, Plaintiffs have suffered pecuniary loss, resulting from the loss of society, comfort, attention, services and support.

101. Defendant's acts and omissions were willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## SEVENTH CLAIM FOR RELIEF

### (Assault and Battery)

102. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

103. The acts described herein constitute assault and battery, actionable under the laws of New York, the laws of the United States and the laws of Mauritania.

104. Defendant authorized, commanded, or directed forces under their command and control to commit battery against Plaintiffs in furtherance of acts of torture, crimes against humanity, war crimes, forced disappearance and/or extra-judicial killings. Defendant intentionally committed acts that resulted in harmful or offensive contact with the Plaintiffs' persons. Plaintiffs did not consent to the contact, which caused injury, damage, loss and harms to Plaintiffs.

105. As a result of these acts, Plaintiffs were placed in great fear for their lives and suffered severe physical and psychological abuse and agony. As a result of the assault and battery described above, Plaintiffs have been damaged in an amount to be proven at trial.

106. Defendant's acts were willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

## EIGHTH CLAIM FOR RELIEF

### (Intentional Infliction of Emotional Distress)

107. The allegations set forth in paragraphs 1 through 71 of this Complaint are realleged and incorporated by reference as if fully set forth herein.

108. The acts described herein constituted outrageous conduct in violation of all normal standards of decency and were without privilege or justification. These outrageous acts were intentional and malicious and done for the purposes of causing Plaintiffs to suffer humiliation, mental anguish and extreme emotional and physical distress.

109. Defendant's outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of New York, the United States and Mauritania.

110. As a result of Defendant's acts, Plaintiffs were placed in great fear for their lives and were forced to suffer severe physical and psychological abuse and agony. As a result of the intentional infliction of emotional distress described above, Plaintiffs have been damaged in an amount to be proven at trial.

111. Defendant's acts were willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages.

**JURY DEMAND**

112. A jury trial is demanded on all issues.

**PRAYER FOR RELIEF**

33

WHEREFORE, Plaintiffs pray for judgment against the Defendant as follows:

a)  For compensatory damages according to proof;

b)  For punitive and exemplary damages according to proof;

c)  For reasonable attorney's fees and costs of suit, according to proof;

d)  For declaratory judgment holding that Defendant's conduct was in violation of the law of nations; and

e)  For such other and further relief as the court may deem just and proper.

Dated: May 23, 2007                        *Attorney for Plaintiffs*

WESLEY M. O'BRIEN (WO-1447)

Refugee Defense Alliance
P.O. Box 1082
New York, NY 10009
Phone: (718) 710-8366

34